UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖

**Cory R. Fountain,**

**Plaintiff,**

**-v-**

**United States of America, United States Department of
Agriculture, and Anwar M. Karim**

**Defendants.**

**8:13-CV-255 (NAM/RFT)
Lead Case**

❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖

**Anwar M. Karim,**

**Plaintiff,**

**-v-**

**United States of America and Thomas Vilsack as Secretary
of the United States Department of Agriculture,**

**Defendants.**

**3:14-CV-964 (NAM/RFT)
Member Case**

❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖

APPEARANCES:

Martin Harding Mazzotti LLP
Robert S. Bruschini, Esq., of counsel
1222 Troy-Schenectady Road
P.O. Box 15141
Albany New York 12212
Attorneys for Corey R. Fountain

Towne, Ryan & Partners, P.C.
James T. Towne, Jr., Esq., of counsel
450 New Karner Road
P.O. Box 15072
Albany, New York 12212
Attorneys for Anwar M. Karim

Hon. Richard S. Hartunian, United States Attorney
Charles E. Roberts, Esq., Assistant United States Attorney
100 South Clinton Street

Syracuse, New York 13261
Attorney for Defendants United States of America and Thomas Vilsack as
Secretary of the United States Department of Agriculture

**Hon. Norman A. Mordue, Senior U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

These actions stem from a motor vehicle accident occurring on August 31, 2010,

involving a vehicle owned by the United States of America and operated by Anwar M. Karim

("Karim") and one owned and operated by Cory R. Fountain ("Fountain"). In the lead action,

*Fountain v. United States of America, United States Department of Agriculture, and Karim*

("*Fountain* case"), 8:13-CV-255, Fountain sues the Government under 28 U.S.C. § 1346(b) as

well as Karim for personal injuries sustained in the accident. Also in the *Fountain* case, Karim

filed an amended answer with a cross-claim (Dkt. No. 52) seeking defense and indemnification by

the United States, and a motion/petition (Dkt. No. 55) demanding a judgment and order under 28

U.S.C. § 2679(d)(3) certifying that he was acting within the scope of his employment at the time

of the accident. In the member action, *Karim v. United States of America and Thomas Vilsack as*

*Secretary of the United States Department of Agriculture* ("*Karim* case"), 3:14-CV-964, Karim

seeks judicial review of the United States' administrative decision refusing to defend and

indemnify him, and judgment declaring that defendants are primarily and solely responsible to

provide full defense and indemnification for Karim in the *Fountain* case and to reimburse him for

defense related costs.

Karim moves (Dkt. No. 73) for declaratory judgment in both actions as follows: (1) in the

*Fountain* case, certifying under 28 U.S.C. § 2679(d)(3) that he was acting within the scope of his employment for the United States of America and the United States Department of Agriculture ("USDA") when the accident occurred; and (2) in the *Karim* case, declaring that defendants are primarily and solely responsible to provide full defense and indemnification for Karim in the *Fountain* case and to reimburse him for defense related costs. Karim admits his negligence caused the accident.

The United States moves (Dkt. No. 75) for summary judgment dismissing the complaint in the *Karim* case on the ground that Karim was acting outside the scope of his employment at the time of the accident. Fountain cross-moves (Dkt. No. 79) for partial summary judgment in both actions.

As set forth below, the Court concludes that Karim was not acting within the scope of his employment as required for FTCA liability under 28 U.S.C. § 1346. Because the United States' waiver of sovereign immunity does not apply, all claims against the United States are dismissed for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Having dismissed all federal-law claims, the Court declines to exercise supplemental jurisdiction over Fountain's claims against Karim, and such claims are dismissed without prejudice.

## FACTUAL BACKGROUND

**The Incident**

The facts are undisputed unless otherwise indicated. On the date of the accident, Karim was employed by the USDA, as he had been for 27 years. His permanent work location was the USDA's Monroe County Field Office, and he resided in Rochester, New York. Beginning on August 1, 2010, Karim was assigned to a temporary duty detail in Walton, New York. The terms

of the temporary detail required that he reside in the local area near Walton instead of his Rochester residence. As a result, Karim lived at a Holiday Inn in Oneonta, New York during the work week, frequently returning to Rochester on weekends. Karim states that his "sole purpose for being in Oneonta, New York at the Holiday Inn on August 31, 2010 was due to [his] employment with Defendant USDA in furtherance of the temporary assignment work." The USDA gave him a per deim for his lodging, meals, and incidental expenses at the Walton detail. Karim used his personally-owned vehicle ("POV") to drive between the hotel in Oneonta and the office in Walton every workday and to drive between Oneonta and Rochester on weekends. He was not reimbursed for mileage for these drives and was considered to be on his own time.

While on the temporary duty at Walton, Karim had the use of a government-owned vehicle ("GOV"), a 2009 Ford Explorer. He was reimbursed for gasoline expenses for the GOV. Karim testified that when he arrived at the Walton location on August 1, 2010, the keys to the GOV were in his desk. He had also had the use of a GOV at his permanent location in Monroe County. At both locations he customarily drove his POV to work in the morning, used the GOV during the work day, and then drove his POV back home. A supervisor's authorization on Form AD-728, "Request an Authorization for Home to Work Transportation" was required for an employee to drive the GOV home at the end of a workday and store it overnight at home.

The temporary detail at Walton involved periodic travel to a field office in Highland, New York. On August 31, 2010, Karim drove his POV from the Oneonta Holiday Inn to work at the Walton office, arriving between 8:00 and 9:00 a.m. At 5:57 p.m. the same day, while still at work, he sent an email to Astor Boozer, his supervisor at the Walton detail, stating: "Request to use Govt vehicle attached." Attached was an AD-728 form completed and signed by Karim, with

checkmarks in the boxes indicating the following as reasons for using the GOV for home to work transportation:

> c. Compelling operational considerations make the provision of home-to-work transportation essential to the conduct of official business or would substantially increase the agency's efficiency or economy.
> ***
>> (5) Storage of vehicle at residence due to economical or security reasons.
> d. Field Work.

On the AD-728 form, Karim added:

> Description: On 8/31 Walton, N.Y. to Oneonta, N.Y.; on 9/1 Oneonta, N.Y. to Highland AO to Oneonta, N.Y. & on 9/2 Oneonta N.Y. to Walton, N.Y.

About three minutes later, at 6:00 p.m. on August 31, 2010, without receiving a response from Boozer or any other supervisor, Karim left the office in the GOV and drove directly to the Holiday Inn in Oneonta. At 6:30 p.m., on a two-lane entrance road to the Holiday Inn parking lot, he crossed the center line, colliding with Fountain's vehicle. The New York State Police Accident Report states that in turning right into the parking lot, Karim "swung turn too wide," causing his vehicle to strike Fountain's. Police issued Karim a ticket for "fail[ing] to give one half of roadway."

**The Investigation**

Astor Boozer, Karim's supervisor at the time of the accident, testified that he learned of the accident on September 1, 2010. At his request, Michele DeMaio Grace, a USDA State Administrative Officer, instructed Theresa Odekirk, a Human Resources Advisor, to conduct an investigation relating to the accident and Karim's use of the GOV. Odekirk issued an investigation report on September 30, 2010, including the following findings: that Karim failed to obtain approval to use the GOV when he drove it from Walton to the Holiday Inn in Oneonta on

-5-

August 31, 2010; that he misused the GOV; that he did not have sufficient justification to submit the AD-728 form because the use was not advantageous to the government or the efficiency of the service; that Karim and his peers in his Monroe County duty location and chain of command fully understood the policy and procedures for requesting overnight storage of a government vehicle; and that Karim was personally provided adequate and complete training on the use of government resources, including vehicles. The report concluded that Karim committed misconduct through his unauthorized use of the GOV in that he failed to obtain proper authorization as required by regulations and he violated agency policy when he took the GOV without advance authorization.

On January 14, 2011, at a meeting with Boozer and DeMaio Grace, Karim was given a letter of reprimand for misuse of government resources, specifically the GOV involved in the motor vehicle accident on August 31, 2010. At that meeting, DeMaio Grace told Karim that the USDA Office of General Counsel advised her that the United States would not defend or indemnify him if Fountain filed a tort claim for damages as a result of the motor vehicle accident.

**Evidence on the Motions**

Karim testified at his June 17, 2014 deposition that he arrived at the Walton office on August 31, 2010 in his POV. He continued:

> Q And what was your plan for the next day?
> A To go to Highland.
> Q Why?
> A I have a job responsibility to go and manage and take care of my responsibilities in the Highland Office.
> ***
> Q Do you remember your activities the day of the 31st before you left Walton?
> A I don't recall my activities.
> Q All right. At some point, did you email an AD-728 to someone about taking one of the government vehicles for home storage at the Holiday Inn in Oneonta?

> A I did.
> Q And do you remember who you sent that to?
> A Astor Boozer.
> Q Did you hear anything back from him?
> A No, I did not.
> Q Was that procedure different from any procedure you had done ever before?
> A No.
> Q Did you indeed take the government vehicle from the Walton location?
> A Yes, I did.
> Q Okay. Did you drive the government vehicle at least to the access route of the Holiday Inn in Oneonta?
> A Yes, I did.

Karim testified that he did not need authorization to use the GOV for day trips. Asked about when the use of a GOV would require "some kind of prior approval," he stated: "Only if you were going to take a vehicle and keep it at your home." Regarding the justification for taking a GOV home, he stated, "because you are going to address a particular need or government activity the very following day."

Questioned regarding Boozer's knowledge that he was taking a GOV on August 31, 2010, Karim testified that he telephoned Boozer after the accident on August 31, 2010 to ask about insurance coverage.

> Q Do you have any basis for believing that Astor Boozer, in fact, knew that you had a government car when you took it at 6 o'clock p.m. on August 31st, 2010?
> ***
> A Yes.
> Q What?
> A When we had our discussion after the accident, he indicated to me that he saw the form come in.
> Q When?
> A Prior to him leaving the office.
> ***
> Q Did he give you any reason to believe that he knew you were taking the government car before 6 o'clock p.m.?
> A Yes.
> Q Please clarify.

-7-

\*\*\*

A When I spoke to Mr. Boozer after the accident, he indicated to me that he saw the form come in and he was aware of it at that point in time but he did not do anything or he did not print it out and sign it. And we left the conversation as that. And then we continued with the inquiry about the insurance and asking for more specific information regarding that.

Q Did he convey any kind of approval, either verbal or in writing, before you took the car?

A No.

Regarding the planned trip to Highland on September 1, 2010, Karim testified:

Q ... And would it be fair to say that when you arrived at work that morning [on August 31, 2010] you planned to go on this trip to Highland the next day?

A I probably planned it on Monday. I normally try to plan my schedule the day I arrive to which would be on Monday afternoon, more or less, plan my week schedule and get my schedule set up in that fashion.

Q So the accident happened on a Tuesday; correct?

A Correct.

Q And so tell me who you were planning to meet in Highland?

A Typically I would just go there and be present in the office. There would be staff there and, if necessary, communicate with staff, various staff, so on and so forth. But beyond that point I would be present in the office, have my presence in the office, probably do work that was conducive to Highland, if not work, conducive to whatever it needed to be done since I covered the entire area.

Q Did you have any specific meeting with anybody, any particular schedule?

\*\*\*

A I don't recall.

Q Okay. So you were going there for just a regular visit to be in the Highland office?

A Basically, yes.

Q There was no particular emergency?

A No emergency.

\*\*\*

Q Do you recall contacting anybody at the Highland office anytime on Monday or Tuesday or before that to tell them that you were going to be there on – on Wednesday?

A I do not recall contacting anyone.

Q Okay. So were they expecting you or not?

A They don't necessarily have to expect me. It was part of my job responsibilities to make sure that I go to Highland so that's what I did.

He does not recall whether he told anyone in the Walton office that he was going to Highland on September 1, 2010. To the best of his knowledge, no one in USDA knew he was going to take the GOV from August 31, 2010 to September 2, 2010. He does not recall telling Boozer of the plan. Asked why he waited to 5:57 p.m. on Tuesday to ask permission for a trip he had planned on Monday, he stated: "There is no specific reason." He acknowledged leaving the office around 6:00 without receiving a response from Boozer or anyone else. He further testified:

> Q     ... You earlier testified that the procedure for home to work transportation for taking the government car home was that you had to have prior approval?
>
> A     Uh-huh, yes.
>
> Q     You didn't have the approval when you did it on August 31st; right?
>
> A     Correct.
>
> Q     Please explain why you felt comfortable doing it?
>
> A     It's a procedure that I have used where wherever I had requested home to work transportation I would submit the form basically at the end of the day to my supervisor and I would get the approval the very next day or the very next morning. That typically had been the case. I didn't think otherwise, that I wouldn't get the approval. So I submit the approval with the confidence of knowing that I will get the approval.

Karim described the route between Walton and Highland as "[h]illy, curvy, mountainous, there is a stretch of highway four lane, two lane, construction, downhill, curvy, windy, steep grades," and the route between Oneonta and Highland as "[t]otally different grades, a lot milder, not as steep, not as windy, very straight-forward." He also testified that there was "long-term construction" on the route between Walton and Highland. Questioned about the USDA's calculation that the planned trip would have been 97 miles longer than a trip directly from Walton to Highland and back, Karim disputed the mileage but did not allege that his planned trip would have been shorter. He acknowledged that his planned route "could have taken more time."

The record includes an AD-728 form Karim emailed to Boozer on August 24, 2010, one

-9-

week prior to the accident, seeking permission to take the GOV from Walton to Oneonta on August 24, 2010, and describing the proposed trip as follows: "On 8/25 Oneonta N.Y. to [illegible] to Oneonta, N.Y. & on 8/26 Oneonta N.Y. to Highland AO to Oneonta N.Y. & on 8/27 Oneonta, N.Y. to Walton, N.Y." It appears that Boozer emailed the request to an assistant on August 26, 2012 and asked that she print it for him. Boozer testified at his deposition that he has no recollection of seeing the email, of asking his assistant to print it, or of seeing a print-out; that he does not know whether Karim took a GOV on August 24, 2010; and that he did not give Karim permission to take a GOV on that date. Karim acknowledges that he took the GOV home on August 24, 2010, without receiving authorization. Karim's testimony on the August 24, 2010 request is as follows:

Q    On August 24th, the trip that we have been referring to during your deposition, did you actually take the government vehicle?
A    Yes.
Q    The same situation was applied then; correct?
A    Correct.
Q    And did you ever receive any notice from Mr . Boozer between 8/24 and the date of your crash 8/31 that he disapproved or didn't understand that you took the vehicle?
A    No.
Q    We learned that he didn't even pay attention to the request, never saw it; correct?
A    Right.
Q    That's what he testified to yesterday; right?
A    Correct.
Q    In your post-accident telephone call to Mr. Boozer which he denies ever having with you, did he talk to you at all about the fact that you were unauthorized to be using that vehicle at the time?
A    No.
Q    Did he ever call you a week later to tell you that you were using an unauthorized vehicle at the time?
A    No.

Karim testified that prior to his temporary duty assignment in Walton, he had submitted

-10-

numerous AD-728 forms to Bruce Hopkins, his supervisor at the Monroe County office for two or

three years before his temporary move to Walton.  On a number of occasions, Hopkins signed the

AD-728 forms after Karim had taken the GOV or while he was still using it. Karim further

testified as follows:

Q       ... During that time that Mr. Hopkins was your supervisor, did you
        ever seek authorization to take a government-owned vehicle for an
        overnight, for overnight storage, I guess it's called?
A       Yes.
Q       And what procedure did you follow during the time that Mr. Hopkins
        was your supervisor to have to do that?
A       I filled out required paperwork and submitted to the area office where
        Mr. Hopkins was located.
***
Q       What is the required paperwork?
A       It's called Home to Work AD-728, something like that.
Q       All right. And that was the procedure that was in place also as of
        August 1st of 2010; correct?
A       Correct.
***
Q       Every time you asked you were authorized, correct?
A       Yes.
***
Q.      ... Were there times that you would complete and forward an AD-728
        on the same day you expected to take the vehicle home for overnight
        storage?
A       Yes.
Q       And before August 1st of 2010, how many times did you do that?
A       I don't know a specific number.
Q       Less than five, more than five?
A       More than five .
Q       Okay. At any point when you did that, was your request denied?
A       No.
Q       ... Were you here when Mr. [Hopkins] testified to the questioning by
        Mr. Roberts at the end of his deposition where he agreed that
        sometimes you would make a phone call to get overnight storage, take
        the vehicle and then file that paperwork afterwards? Did you hear him
        testify to that?
A       Yes, I did.
Q       Did you use that procedure now and again?
A       Yes.

> Q        Were you ever reprimanded before August 31st, 2010 for using that
>           procedure –
> A        No.
> Q        – where you filed the same day for overnight storage or made a call
>           for overnight storage and filed later?
> A        No.

Also regarding the practice with Hopkins at the Monroe County office, he stated that, on "more than five" occasions over a period of "two to four" years:

> I would fill out the form similarly to what I filled out here, submit the form to my supervisor and then take the vehicle to my home and then the following day carry out my official government duties and then bring the vehicle back the next day. And I would receive this particular document signed by my supervisor the next, the following day.

Asked whether he had gotten prior verbal approval on those occasions, he stated: "Maybe a couple instances probably didn't have prior verbal approval."

Boozer testified that Karim did not call him the night of the accident and that he learned of the accident on the following day, September 1, 2010. His declaration on this motion, which is consistent with his deposition testimony, states:

> 6.        I did not read Mr. Karim's email sent at 5:57 PM, at any time before this accident occurred on August 31, 2010. I did not receive a phone call or text message from Mr. Karim requesting verbal approval. I did not give Mr. Karim approval, either written or verbal, at any time before he took the government vehicle or was involved in the accident on August 31, 2010. I was Mr. Karim's direct supervisor at the time of this accident. He needed approval from me to take this vehicle. I have never given Mr. Karim approval at any subsequent time to take the government vehicle for overnight storage on August 31, 2010. The requirement for approval before taking a government vehicle for overnight storage applies to all USDA employees.
> 7.        Based upon my experience as a supervisor in USDA..., an employee who takes a vehicle for overnight use without receiving prior written or verbal approval is taking the vehicle contrary to agency policy, and is doing so at his own risk.

Boozer testified that if Karim needed to travel to the Highland office, the procedure would

-12-

be for him to drive his POV from Oneonta to Walton, pick up the GOV and drive it to Highland and back to Walton, and then leave the GOV at Walton and drive his POV to Oneonta at the end of the day.  Boozer testified:

> Q        ... And prior to the occurrence of this accident, did you have any objection in general to Mr. Karim taking a government vehicle home if he had to travel outside of the Walton area the next day?
>
> A        Yes. The objection would have been that it needed to be approved first and there would have [to be] a need for a substantive benefit for the government.
>
> ***
>
> Q        Had Mr. Karim taken a government vehicle home from the Walton office to his residence at the Oneonta hotel prior to the date of this accident?
>
> A        Not that I am aware of.
>
> Q        So you weren't aware of his taking the government vehicle on August 24th, correct?
>
> A        Correct.
>
> Q        Do you recall ever approving Mr. Karim taking a government vehicle home from the Walton office to his Oneonta hotel?
>
> A        No.
>
> ***
>
> A        ... If he had have been approved it could have been part of his job duty.
>
> Q        So the dispute is that you are claiming he wasn't approved?
>
> A        Correct. And the other part of that is that, you know, the efficiency of the government would be a question that I would have had to approve. Whether that was efficient for him or not has nothing to do with this. And also if there is a, you know, a need to have, you know, if it's a timely issue for the individual to leave and go to their particular location. So that would have been more than just the question that you are asking that we would have had to discuss.
>
> Q        Well, let me ask you this. Do you have any information from any of your sources whatsoever that Mr. Karim did anything of personal or private nature between taking the vehicle from Walton and going to the hotel in Oneonta?
>
> A        Not that I am aware of.
>
> ***
>
> Q        Now, are you aware of any situations in which an employee, before he left, was allowed to have verbal authorization so long as it was followed up with a written authorization?
>
> A        The – I am not aware per se. But in extenuating circumstances that

-13-

were time sensitive, at the moment of where I was not in a place of where I could receive a written document or even review and a call, would be something that we could consider.

The file also contains an undated SF-91 Motor Vehicle Accident Form signed by Boozer in which Boozer wrote "No Authorization" in response to the question whether authority for the trip was given to the operator orally or in writing. In the section for "Did this Accident Occur Within the Employee's Scope of Duty" he checked the box for "No" and added the following handwritten note: "Employee took GOV without signed authorization. Request would have been denied as not advantageous to govt. Employee not performing within the scope of his official duties."

Also in the file is an "Optional Form 26," headed "Data Bearing Upon Scope of Employment of Motor Vehicle Operator," apparently prepared by Karim. It is signed by Karim as "Operator" on August 31, 2010 and by Boozer as "Operator's Supervisor" on October 9, 2010. The form states: "Authority for Operator's Use of Vehicle Was Given," and the box for "In Writing" is checked. The following is filled in: "Submitted request AD-728 prior to leaving office via email." The space for "Exact Purpose of Trip" is filled in as follows: "Travel to Highland, N.Y. to the Service Center. Planned schedule depart Walton on 8/31 to Oneonta then on 9/1 depart to Highland & return same day to Oneonta. On 9/2 depart to Walton - end of trip." It indicates that there was no deviation from the direct route, that the trip was not made within established working hours, and that Karim left work at 6 p.m. When asked at his June 17, 2014 deposition about his signature on this form, Boozer testified:

> Well, and here I am not making any assumption, I definitely try to review the material to be correct. And that could have been something that I just flat overlooked . But that in writing is not correct. So I'm saying that just to the best of my knowledge my signature says this is correct. But after reviewing

-14-

now and knowing that I did not respond to anything in writing, I would say that that would be incorrect.

When questioned about Optional Form 26 at her August 5, 2014 deposition, Odekirk stated that she had never seen it before. She noted that Boozer had signed it after her investigative report had been completed on September 30, 2010, and that if she had seen it as signed by Boozer during the course of her investigation, she would have reached a different conclusion as to whether Karim was authorized to use the GOV on August 31, 2010.

On this motion, Odekirk submits an affidavit stating that when she testified on August 5, 2014 regarding Optional Form 26, she did not know that Boozer had already testified at his June 17, 2014 deposition that his signature on the form was incorrect. She continues: "Now knowing that Mr. Boozer erroneously signed the Optional Form 26 ... the signed Optional form 26 has no affect [*sic*] on my findings that Karim committed misconduct. Mr. Karim took the vehicle without the required authorization, and committed misconduct."

An exhibit to Odekirk's report is Departmental Regulation #5400-5 on the subject of "Use of Government Vehicle for Home-to-Work." It states: "All instances of home-to-work transportation must be documented fully with necessary reports, logs, or records of such use. Form AD-728, Request and Authorization for Home-to-Work Transportation, is to be used for this purpose." It also states that home-to-work transportation for specified positions is authorized "when actually performing field work and then only to the extent that such transportation will substantially increase the efficiency and economy of the Government." It adds: "The comfort and convenience of an employee shall not be considered as justification for such authorizations."

Odekirk's deposition testimony includes the following:

Q        ... And did part of [your] investigation address the misuse of

-15-

> government resources, the GOV, arising out of the route chosen to get to the Highland Falls office?
>
> A    Yes.
>
> Q    Okay. And what conclusion did you draw as a result of the route that Mr. Karim followed versus what your investigation concluded?
>
> A    I concluded that he did not have sufficient justification to take the Government vehicle for storage, based on there was no advantage to the Government, mileage wise. ... [W]henever someone takes a vehicle, there has to be an advantage to the Government, okay? The route that he chose had to have less miles than going from Walton to Highland.
>
> ***
>
> A    I looked at the route that he should have taken, which would have been from his duty location, Walton, to Highland. I looked at what – any other routes that could have been taken. When I interviewed Mr. Karim during the investigation, he didn't give me any other routes, other than what had been provided to me, and it clearly was – there was no safety issue. The roads were dry. It was August 31st. It hadn't rained. There wasn't any snow. So I couldn't find any reason for him not to take the most efficient route, which would be from Walton to Highland.

Asked about possible construction on the Walton-to-Highland route, she stated: "I cannot say whether I would come to a different conclusion, because I would have to look at the other routes, because in the summertime here in New York construction is a way of life. So there may have been construction on the other routes, I wasn't aware that there was on this route." She acknowledged that sometimes it "made sense" for a supervisor to give only verbal approval and sign authorization after the fact, and observed: "Sometimes somebody is going to be in the field, and they're not going to know, you know, until something happens that they're going to have to take the vehicle for storage or whatever."

Bruce Hopkins, who supervised Karim at his Monroe County position, submitted a declaration stating:

> 3.    As a supervisor, I have allowed employees to take government vehicles for overnight storage, without having a final signed AD-728

form, but only if they have my prior verbal approval, before they take the vehicle. This practice reflects the practical need for employees to use vehicles, often on short notice as needed-but always with prior approval. This is the practice which I have followed with all employees, and it is the practice which I followed with Anwar Karim. ***

5.  The memorandum [of law submittedby Mr. Karim in support of his motion for declaratory judgment] states that "Mr. Karim and his prior supervisor, Bruce Hopkins, engaged in a prior course of procedure in which he would submit his request to use the vehicle overnight to his supervisor immediately prior to leaving his workplace, utilize the vehicle to use [sic] as indicated, and Mr. Hopkins would sign off on the form AD-728 after his use of the vehicle on the date of his use yet after he had obtained the vehicle.". In his declaration, Mr. Karim similarly states that "My prior supervisor, Bruce Hopkins, approved and authorized my use of a government vehicle either on the day of or within the next few days after I had taken and/or used the vehicle."

6.  As I stated above, I sometimes do sign the AD-728 form after an employee takes the vehicle – but <u>only after the employee obtains my prior verbal approval</u>. I have never allowed an employee to take a government vehicle without first obtaining written or verbal approval. I have never allowed Anwar Karim to take a government vehicle without first obtaining written or verbal approval. Insofar as the memorandum of law and Mr. Karim's declaration imply that I have allowed Anwar Karim to take a government vehicle without obtaining prior written or verbal approval, they are factually incorrect and do not reflect my practice with Mr. Karim and all of my employees. ***

9.  On several occasions, after Mr. Karim obtained my verbal approval, he faxed my office the AD-728 form late in the day (on the day before his planned trip). These requests arrived after I had left the office. I counseled him on several occasions about this, and advised that he had to send these forms in earlier, and that there was no reason to wait all day and then file a last minute request for approval. To the best of my recollection , one of these counseling sessions was during a performance review. I also had periodic conversations with Mr. Karim in which I told him that he needed to be more diligent in sending in forms and other paperwork in earlier. Mr. Karim often sent in various paperwork, such as requests for information and overnight vehicle storage forms, late or at the last minute.

(Emphasis in original; citations to record omitted.)

## APPLICABLE LAW

"The United States, as sovereign, is immune from suit save as it consents to be sued ...,
and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the
suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). In the Federal Tort Claims Act
("FTCA"), the United States granted a limited waiver of sovereign immunity with respect to
claims for money damages for personal injury "caused by the negligent or wrongful act or
omission of any employee of the Government while acting within the scope of his office or
employment." 28 U.S.C. § 1346(b)(1). Because the FTCA creates a waiver of sovereign
immunity, it is strictly construed in favor of the Government. *Liranzo v. United States*, 690 F.3d
78, 84 (2d Cir. 2012). The party asserting subject matter jurisdiction bears the burden of proof by
a preponderance of the evidence. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.
2000).

## ANALYSIS

In *Hamm v. United States*, the Second Circuit considered the scope of the government's
liability when a military reservist is involved in a car accident on his way to a training exercise.
483 F.3d 135 (2d Cir. 2007). After observing that, under the FTCA, "acting in line of duty" in the
case of a member of the military equates to "[a]cting within the scope of his office or
employment" in the case of a civilian Government employee, the Circuit Court looked to New
York's case law to determine whether the reservist was acting within the scope of his
employment at the time of the accident. The *Hamm* court explained:

> Under New York law, an employee acts within the scope of his employment
> when both (1) "he is doing something in furtherance of the duties he owes to
> his employer," and (2) "the employer is, or could be, exercising some control,
> directly or indirectly, over the employee's activities." *Lundberg v. State*, 25

-18-

> N.Y.2d 467, 306 N.Y.S.2d 947, 255 N.E.2d 177, 179 (1969); *see also Marfia v. T.C. Ziraat Bankasi, New York Branch*, 100 F.3d 243, 252 (2d Cir.1996) ("In New York, a master is not responsible for the wrongful acts of his servant who was not subject to the actual or potential control of the master when the wrongful acts took place." (citing *Lundberg* )).
>
> *Lundberg* makes clear that, "[a]s a general rule, an employee driving to and from work is not acting in the scope of his employment," because "[a]lthough such activity is work motivated, the element of control is lacking." 306 N.Y.S.2d 947, 255 N.E.2d at 179.

*Id.* at 138. The *Hamm* court rejected FTCA liability, finding that the military lacked control over the reservist because it had not required him to drive between the locations, nor had it instructed him on the route to take or implicitly directed the route by providing him with a limited amount of time to make the journey; rather, the reservist's drive "was done purely on his own time in order to commute to his place of employment." *Id.*

In the instant case, the fact that Karim was driving a GOV at the time of the accident (whereas the reservist in *Hamm* was driving a POV) does not alter this analysis; the determinative issue remains whether he was acting within the scope of employment under section 1346(b). *See, e.g., Williams v. United States*, 183 Fed.Appx. 125 (2d Cir. 2006); *see also Hawkins v. Fowler*, 430 F. App'x 329, 332 (5th Cir. 2011); *Garcia v. United States*, 88 F.3d 318 (5th Cir. 1996); *Borrego v. United States*, 790 F.2d 5, 7-8 (1st Cir. 1986); *Robinson v. Dunlap*, 2014 WL 6698633 (D.Md. Nov. 26, 2014).

Applying the *Lundberg* standard here, the Court finds as a matter of law that at the time of the accident Karim was not acting in furtherance of the duties he owed to his employer, and that the USDA was not and could not have been exercising direct or indirect control over his activities. It is undisputed that Karim was required to use his POV to commute between the office in Walton and his hotel in Oneonta and that he was not reimbursed for the mileage

involved in making this commute, which he made on his own time. The proper procedure was for him to drive his POV to Walton, use the GOV stored at Walton for his trips into the field during the workday, then return the GOV to Walton and drive home in his POV. Karim knew he was required to have authorization to take the GOV home at the end of the workday, and he knew he did not have such authorization when he took the GOV on August 31, 2010. Karim's testimony that he intended to use the GOV the following day on USDA business does not support a finding that he was acting in furtherance of his employment when the accident occurred. Likewise, Karim's personal preference to drive to Highland from Oneonta rather than from Walton does not support a finding that he was acting in furtherance of his employment. Indeed, Boozer testified that even if Karim had made a timely request for authorization, he would have denied it; the evidence was that Karim's proposed route added almost 100 miles to the round trip. Nor do the facts support a conclusion that the Government was or could have been exercising control over Karim's use of the GOV; the Government did not approve of the use or even know about it until after Karim had already taken the vehicle. Nor did the USDA require him to drive the GOV between Walton and Oneonta, instruct him on the route to take, or implicitly direct the route by providing him with a limited amount of time to make the journey; rather, Karim made the trip purely on his own time in order to commute home from his place of employment. *See Hamm*, 483 F.3d at 138.

It is not necessary to resolve the factual questions regarding the practice at the Monroe County office in order to conclude that Karim was not acting within the scope of employment at the time of the accident. Even accepting Karim's allegation that Bruce Hopkins "retroactively" approved his use of the GOV occasionally during the years Hopkins was Karim's supervisor at

Monroe County, this does not support a finding that, on August 31, 2010, Karim was acting in furtherance of the duties he owed to the USDA or that the USDA was or could have been exercising direct or indirect control over his activities. Nor does the fact that Karim had taken the GOV home from the Walton site one week earlier, on August 24, 2010, assist Karim in showing that he was acting within the scope of his employment on August 31, 2010; Karim admitted that Boozer did not give him permission for the August 24, 2010 trip and did not "retroactively" approve it.

Karim's reliance on Optional Form 26 is unavailing. Boozer clearly testified that his signature on that form, indicating that Karim had written authorization to use the GOV on August 31, 2010, was "incorrect." Regardless of Boozer's credibility, Karim's own testimony is unequivocal that he did not have either written or verbal authorization prior to taking the GOV on August 31, 2010. It is irrelevant whether he spoke to Boozer on August 31, 2010 after the accident, as Karim claims; even if true, this would not constitute prior written or verbal approval.

On a thorough review of the record, the Court concludes as a matter of law that Karim was not acting within the scope of his employment at the time of the accident. The United States and USDA are entitled to dismissal of all claims against them in both actions on the ground of lack of subject-matter jurisdiction.

Having dismissed all federal-law claims, the Court weighs "the values of judicial economy, convenience, fairness, and comity" in deciding whether to retain jurisdiction over the state-law claims. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Although there is no "mandatory rule to be applied inflexibly in all cases," it is clear that "in the usual case in which all federal-law claims are eliminated before trial," the balance of factors will weigh in

favor of declining to exercise supplemental jurisdiction. *TPTCC NY, Inc. v. Radiation Therapy Servs., Inc.*, 453 Fed.Appx. 105, 107 (2d Cir. 2011). Upon consideration of relevant factors, the Court declines to exercise supplemental jurisdiction over Fountain's claims against Karim, and such claims are dismissed without prejudice.

**CONCLUSION**

IT IS THEREFORE

ORDERED in *Fountain v. United States of America, United States Department of Agriculture, and Karim*, 8:13-CV-255, that Karim's cross-claim (Dkt. No. 52), seeking defense and indemnification by the United States, and his motion/petition (Dkt. No. 55) demanding certification under 28 U.S.C. § 2679(d)(3) are denied and dismissed for lack of subject-matter jurisdiction; and it is further

ORDERED that Karim's motion (Dkt. No. 73) for declaratory judgment in *Fountain v. United States of America, United States Department of Agriculture, and Karim*, 8:13-CV-255, and *Karim v. United States of America and Thomas Vilsack as Secretary of the United States Department of Agriculture*, 3:14-CV-964, is denied; and it is further

ORDERED that all claims against the United States and the United States Department of Agriculture in *Fountain v. United States of America, United States Department of Agriculture, and Karim*, 8:13-CV-255, are dismissed for lack of subject-matter jurisdiction; and it is further

ORDERED that the United States' motion (Dkt. No. 75) for dismissal of *Karim v. United States of America and Thomas Vilsack as Secretary of the United States Department of Agriculture*, 3:14-CV-964, for lack of subject-matter jurisdiction is granted; and it is further

ORDERED that the action *Karim v. United States of America and Thomas Vilsack as*

-22-

*Secretary of the United States Department of Agriculture*, 3:14-CV-964, is dismissed in its entirety on the merits; and it is further

ORDERED that Fountain's cross-motion (Dkt. No. 79) for partial summary judgment on the issue of liability against Karim in *Fountain v. United States of America, United States Department of Agriculture, and Karim*, 8:13-CV-255, is denied without prejudice to an action in New York State courts; and any relief Fountain seeks against the United States in either *Fountain v. United States of America, United States Department of Agriculture, and Karim*, 8:13-CV-255, or *Karim v. United States of America and Thomas Vilsack as Secretary of the United States Department of Agriculture*, 3:14-CV-964, is denied with prejudice; and it is further

ORDERED that the Court declines to exercise supplemental jurisdiction over Fountain's claims against Karim in *Fountain v. United States of America, United States Department of Agriculture, and Karim*, 8:13-CV-255, and they are dismissed without prejudice to an action in New York State courts; and it is further

ORDERED that the Clerk of the Court is directed to close both cases, *Fountain v. United States of America, United States Department of Agriculture, and Karim*, 8:13-CV-255, and *Karim v. United States of America and Thomas Vilsack as Secretary of the United States Department of Agriculture*, 3:14-CV-964.

IT IS SO ORDERED.

Date:   September 23, 2015

**Norman A. Mordue**
**Senior U.S. District Judge**

-23-